61137 Commonwealth of Massachusetts et al. v. Wampanoag Tribe of Gay Head et al. Good morning, may it please the court, Scott Crowell on behalf of the Wampanoag Tribe of Gay Head, the Wampanoag Tribe of Gay Head, and the Wampanoag Gaming Corporation. I request three minutes for rebuttal. My colleague from the United States and I have agreed that she will speak for seven minutes, so I will speak for five, reserving three. Our comments focus on two critical errors of the District Court's analysis. First, the District Court erred in concluding that Congress did not impliedly repeal the Massachusetts Settlement Act's restrictions on tribal gaming. Second, the District Court erred in finding that Aquinnah's governmental infrastructure and programs are insufficient to establish IGARA's requirement for the tribe's exercise of governmental authority over its Indian lands. Twice before, the Supil's Court has been asked to determine whether the Indian Gaming Regulatory Act impliedly appeals earlier-in-time Indian land claims settlement acts. In one situation, Narragansett, this Court found that it did. In the other situation, Passamaquoddy, the Court found that it did not. Both of those cases are instructive here. In Passamaquoddy, the Court found an explicit savings clause in the face of the statute to be controlling. To quote, But that language is not in the Massachusetts Settlement Act. Congress does not legislate in a vacuum. If Congress had intended the results sought by the Commonwealth and the Homeowners Association, it would have used that same language. It did not. Instead, appellants concede that the language at issue in the Massachusetts Settlement Act and the Rhode Island Settlement Act are substantially the same. Quote, The settlement land shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island. And quote, The settlement land shall be subject to the civil and criminal laws, ordinance, and jurisdiction of the Commonwealth of Massachusetts. Except that the Massachusetts Settlement Act adds a parenthetical. Quote, Open paren, including those laws and regulations which prohibit or regulate the conduct of bingo or any other game of chance. Close paren, close quote. The Aquinnah tribe finds this distinction to be unremarkable. This circuit acknowledged in Narragansett that the civil and criminal laws of the jurisdiction of the State of Rhode Island included Rhode Island's gaming laws. The parenthetical in the Massachusetts Settlement Act makes the same acknowledgement. Applying basic rules of grammar, that's what parentheticals are for, identifying a specific subset of a larger sentence. Now the district court below and the Commonwealth and homeowners on appeal argue that the parenthetical commands the exact same result as the explicit savings clause that issued in Passamaquoddy. That's clear error. Moreover, Aquinnah establishes both that the Indian Gaming Regulatory Act and the Massachusetts Settlement Act are repugnant to one another and establishes that Congress intended to occupy the field in the passage of the Indian Gaming Regulatory Act. The Commonwealth and homeowners argue that the two statutes can be harmonized because Congress in the passage of IGRA intended for not to apply where the gaming activity is otherwise, quote, prohibited as a matter of federal law. The district court erred when it found that the Massachusetts Settlement Act to be such a federal prohibition even though that law expressly allows for gaming consistent with the laws of Massachusetts which laws have always allowed for some forms of gaming including bingo and now allows for all forms of gaming including full-blown casino resort gaming. My colleague from the Department of Justice will expand on this. Second, on the governmental powers issue, the Commonwealth and homeowners in their briefs have turned the Indian Gaming Regulatory Act on its head and now argue that only those tribes which already have in place the mature, developed governmental infrastructure to handle all aspects of a gaming operation without the use of intergovernmental agreements exercise the requisite government power under IGRA for the lands to qualify for gaming. In other words, Congress intended to enable tribes to use governmental gaming revenue to position tribes to have strong tribal governments but it's only available to those tribal governments that are already sufficiently strong that they exercise all the governmental powers that would be necessary in order to allow for a gaming operation to exist. That is turning the intent of Congress on its head. The purpose of the Indian Gaming Regulatory Act was to enable tribes who historically, in large part because of the lack of adequate federal government, don't have the means necessary to establish, develop strong tribal governments in terms of establishing police forces, schools, regulatory agencies, etc. The purpose of the Indian Gaming Regulatory Act is to enable tribes to mature to the point of being able to have such sufficient operations on their Indian lands and the district court denied the tribe for that opportunity. Perfect timing. You must have anticipated. No questions. Thank you. Ms. Harvey. May it please the court, I represent the United States as a NICAS in support of the tribe. Picking up on Mr. Crowell's point about implied repeal, a key to this issue in the United States' view is understanding the difference between the terms prohibition and regulation. The police rely on the portion of IGRA which says that something that is specifically prohibited by federal law does not qualify under IGRA. But this distinction is important. It goes back to the Cabazon-Boone Supreme Court decision where the Supreme Court held that California was granted criminal jurisdiction over Indian lands but not civil jurisdiction. So therefore, if California did not criminally ban gaming, it could not civilly regulate it. And so importantly, the court made a distinction between, it said that criminal penalties for unlicensed bingo are in fact regulatory. So Massachusetts has a regulatory licensing regime in place for gaming. And so that is regulatory even though it contains criminal penalties for violating that regulatory licensing scheme. But what difference does it make what laws Massachusetts have and whether we call them prohibitions or regulations? Isn't the statutory inquiry here a focus on whether there's not just a prohibition but a prohibition by federal law? Right. And here, what the district court said and what a police claim is that the federal law issue is the settlement act, the Massachusetts Settlement Act, which provides for civil and criminal jurisdiction by the state over activities including gaming. And so here what you have is- So are you conceding that turns a Massachusetts- suppose we were to find there was a prohibition in Massachusetts law, then would you concede that the district court decision is correct that we should construe that as a federal law? What I'm saying is you have to look in terms of understanding what a prohibition is. You have to look at the context- But you're wrong that it is a prohibition under Massachusetts law. What does that mean then? There could still be an implied repeal of the prohibition. And so what happened was at the time that Cabazon was passed, there was a regulatory gap. And so the settlement act was passed in a brief regulatory period after Cabazon, but before IGRA passed comprehensive regulatory gaming regulations. So what happened was the act was- Let me ask you this way. Is it the government's position that we should find that the earlier act, in fact, is a federal law that regulates gaming? It is a federal law, but it provides- Well, what it does is it gives the state- The whole act is a federal law. Is it a federal law that regulates gaming as opposed to a federal law that says that a certain territory will be subject to regulation by Massachusetts? The law. It is a federal law that provides for jurisdiction, concurrent jurisdiction by the state of Massachusetts. So that's how we view what the settlement act does. Would your position be any different if Massachusetts law at the time, if it was agreed that Massachusetts law at the time flatly prohibited any gambling activities? As a criminal lawyer? Yes. I think so, but you would have to- Our position is more to- Because what we have here is a regulation. Sticking to- if it were flatly prohibited, and if that then meant that it constituted a federal prohibition, that's a shifting sand, isn't it? Massachusetts would be able to control federal law in the future. Well, I think what Congress intended was that in passing a bill that it is appropriate to look at state law in certain circumstances. That's why in order to conduct Class II gaming in all circumstances, not just what we're seeing here, the child would have to go- you'd have to look at what the state structure is. It can- for Class II, if it entirely prohibits the activity, then it is not regulated. If it entirely prohibits the activity, then you're not able to game in America. But now you're just pointing out that IGRA doesn't allow the gaming if the state flatly prohibits it altogether, at least for some types of gaming. But I think the Chief Judge's question puts IGRA to one side and brings us back to the command that only such gaming- that such gaming is not otherwise specifically prohibited on Indian lands by federal law. And we're trying to get at why you want us to draw a distinction between a prohibition and a regulation unless you're conceding that the prohibition or regulation that you're directing is indeed a federal law, so we do need to find whether it's a prohibition or not. Well, the first position is that what the act does is grant jurisdiction to the state. That's what it does. We're merely responding to the point of the district court, you know, up in the leaves, who are saying that, you know, it does not fall under IGRA because it's a specific prohibition. And so if this court finds that the act is merely one- let's say it provides for jurisdiction to the state, then it does not need to get into the distinction between what a prohibition is or what a regulation is. And you see this as a straightforward extension of the American Insight. As my colleague, Mr. Crowl, said, I was merely trying to provide another position in the event that this court disagrees with that distinction. If I could briefly turn to the governmental powers portion of the argument. The Aquinnah Tribe is a mature tribe in government. It is more than satisfied of the reclaiming of American Insights and looked at the factors that the National Indian Gaming Commission relies on. If adopted, the district court's restrictive approach would make it difficult for not just the Aquinnah Tribe but other tribes to meet this standard. For example, the district court focuses on things such as cross-stabilization agreements. 90% of tribes have that in place. Thank you. Excuse me. Could I just ask you something? I'm sorry? Do they have a status as a housing authority? They have a housing authority that has built tribal housing units. They regularly submit maintenance plans. Anything else? Is it housing or beyond housing? Beyond housing. Oh, certainly beyond housing. I want to make sure I have the list here. Oh, sure. With respect to the environmental programs, it is treated as a state for purposes of the Clean Water Act and through all other federal environmental statutes. It has passed many ordinances related to conservation. It has two tribal rangers. The brief details many, many other examples. But this is not a tribe that has just been established. It has had 30 years to develop these structures despite limited funds. And if you were to adopt it… It has a governmental structure, doesn't it? Oh, yes. It has a governmental structure. It submits ordinances. It has a constitution. You're always in the dish of governmental authorities. I mean, this is not just mere theoretical. They're actually exercising governmental power through contracts. Even if it doesn't physically do the work itself, it contracts with other entities to provide services for its members. Thank you. Please. Good morning, Your Honors. May it please the Court, Felicia Ellsworth on behalf of the Aquinnah Gay Head Community Association. I'll be addressing the question of whether IGRA applies to lands in question. My colleague from the Commonwealth, Ms. Rice, will address the interplay between IGRA and the Federal Act. And Mr. Rappaport from the town will address a few town-specific issues. Turning to the questions just asked by Judge Troya in terms of governmental power, I think it's important to look at the language of IGRA in terms of what is the exercise of governmental power directed at. The inquiry is whether the tribe is exercising governmental power over the lands on which it seeks to engage in gaming. And as the district court found, based on undisputed facts in the record, a dispute over what those facts mean, but the facts themselves are undisputed, the tribe failed to shoulder its burden to show that it, in fact, does exercise governmental power over the settlement lands. And the district court relied on several key aspects of governmental power that are exercised by the town over the settlement lands and not by the tribe. What about the tribal ordinance regarding fish, wildlife, and natural resources? Doesn't that concern the tribal land? The ordinance about fish, wildlife, and natural resources, I believe, does affect settlement lands. But the question is not whether the governmental power, it exercises any governmental power at all. The issue is whether it exercises governmental power as we submit IGRA had in mind. That's a pretty big exercise of power over land, is to regulate the fishing, the wildlife, the natural resources on the land. Why isn't that enough in and of itself? So I would submit that the intersection between governmental power and what jurisdiction the tribe exercises over the land is an important one. And here the language of the settlement act, the Massachusetts Specific Act, in section 1771E specifically limits the tribe's jurisdiction over the settlement lands. It limits it in two important ways. It limits it, first of all, that there's no jurisdiction over non-tribal members. And it also provides that the settlement lands are limited in that there's no exercise of jurisdiction that contravenes the laws of the federal government, the commonwealth, or the town can be exercised. And so this court in Narragansett, when it considered what it means to have jurisdiction over lands for purposes of IGRA, drew a distinction between the inherent jurisdiction that tribes have, which go with things such as membership, inheritance, domestic relations, and the jurisdiction over civil and criminal authority. What about the housing ordinance? So the housing ordinance, there are 30 units of tribal housing on the settlement lands. And you're asking us to find that a government regulation of housing on land is not an exercise of government regulation over the land? What we're asking the court to find is that the district court was correct to conclude that the tribe had not met its burden to show it exercised sufficient governmental power. So if you regulate the fish, the wildlife, all the natural resources, which in many areas of the country would be 99% of the value of the land, and you regulate the housing and lead paint in the housing, that you still haven't done enough? The lead paint ordinance, just to be clear, Your Honor, was not in effect. It has lapsed at this point in time, and it lapsed at the time the record was closed. That's true of many of the ordinances that the tribe submitted in support of its governmental powers submission. Now drop out the lead paint, then. So we've just got natural resources, we've got wildlife, we've got fishing. What we don't have, Your Honor, is police. We don't have fire. We don't have health services. We don't have a building inspector. We don't have providing any education. They say they don't have the money to do that because of the fact that they need a casino. The fact of the matter is that in order for IGLA to apply to lands on which a tribe wishes to engage in gaming, it needs to exercise governmental powers. And as the district court found, there's a reason for that. And the reason is in a class 2B... You didn't answer my question. I'm sorry. If you could repeat the question again, Your Honor. The question is, well, it's more somewhat of an argument to this question, but the answer they give, as I understand, why they don't have the activities you just indicated, police, fire department, et cetera, is because they don't have the ability to raise the revenue to support that structure. They will do it when they have a casino that will provide revenue. They do state that, Your Honor. And as Ms. Brice will address, they gave up that right in 1983 when they entered the settlement agreement. I understand that... They gave up what? The right to conduct gaming on their lands. And maybe I'll step back and remind the court of the settlement agreement. I don't remember it was passed. Then they say they got it back. Certainly that's a submission, but the settlement agreement states that quite explicitly, that the tribe holds these lands in the same manner as any other Massachusetts corporation. Now, that's language that the SJC has concluded affected a complete waiver of the tribe's sovereign immunity with regard to land use. You say there were no law enforcement functions. I thought they had two people who had an agreement with the town. They have tribal rangers, Your Honor, who cannot exercise any authority. They can't arrest nine tribal members or do any of those things absent cross-deputization. But what about tribal members? There's no tribal criminal code. There's no criminal code or prosecutor to... How about housing violations or violations of the ordinance? Can they enforce violations of the wildlife ordinance? They're natural resources rangers, Your Honor, so it has to do with the environmental aspects. So they can. My understanding is they can. They are not cross-deputized by the town. They've got a law enforcement function on one of the central aspects of controlling land, which is the natural resources of land. So it sounds like they have a couple of people who can go out, and if you're doing stuff to the land you're not supposed to do in violation of the ordinance, and if the tribal member is doing it, they can stop them. That sounds like government to me. And, again, I'll just briefly respond and then sit down. Your Honor, our submission is that it is the types of public safety and health authority that is exercised only by the town. Otherwise known as the core functions of government. Well, exactly, and that's what's exercised by the town here and not the tribe. But I may have missed something. You've said now at least twice that they don't have a health responsibility. I thought they had entered into a compact with a federal agency, which does allow them to provide health services. There is a part-time clinic that is in an administration building on the settlement land. There's no emergency health provision. So if there's an accident, if there's an emergency, emergency health services are provided by the Tri-Town Ambulance Service that comes onto the land. Do they or do they not provide health services? They provide health services in the form that there's a clinic somebody can visit, yes. Why is it a clinic health services? It is health services. That's how I was trying to answer. My point is it's not an emergency health service. That was one of the distinguishing factors that we relied on in Narragansett. In Narragansett, the record is not as fully developed as it is here. I would submit that here what the tribes get... It needs to be emergency services? That seems to be your argument. The argument is that the government power that is required under IGRA is a government power that can fill the void that would be left by an absence of state authority here. So if a casino was allowed to be opened on these settlement lands and there was an accident, it is the town that is going to have to be responsible for providing whatever services might be needed. If there's a crime committed, it is the town that will have to be responsible for providing services. They have a clinic that provides health services. Are you saying they're prohibited from providing emergency services if the need arises? No, but the question is what authority are they actually exercising now? And, again, it is their burden to show that. Health services. So a part-time clinic that's staffed by a registered nurse would not be sufficient to address the types of issues that might arise at a commercial gaming facility. All right. Thank you. Also, you're right. Is there something to the Catch-22 here? Because, I mean, is there anything in the record that would remind us, at the time IGRA is passed, if we looked at all the tribes that did not have a casino, for example, such as allowed by IGRA, how many of them had the resources before they got the casino to provide all the law enforcement functions and other functions that would be necessary if you had a casino? And if we require that they first have the resources to fund all the services that are ancillary to having a casino, then that would mean none of the tribes that exist at the time IGRA was passed that didn't have casinos could ever get one. It just seems there's a Catch-22 to your argument. So I don't know the answer to the factual question as to how the different services offered by the tribes sort of shook out. But, again, I would go back to the point that IGRA is meant to strike a balance between the tribes and the states and the federal government. And where a tribe is permitted to supplant state and local authority, as the tribe submits it is here, somebody needs to fill that void. And here, were the tribe allowed to proceed, it would be the town involuntarily filling that void in terms of the law enforcement, emergency health, and many fire services, all of which are the types of concerns that IGRA was intending to address, right? The concern about organized crime, et cetera, in connection with casinos. Thank you. All right. We'll hear from the Commonwealth. Good morning. May it please the Court. Juliana Rice for the Commonwealth of Massachusetts and the Commonwealth Appellees. Even if this Court were to conclude that IGRA would otherwise apply, the Settlement Act continues to govern gaming on the settlement lands and was not impliedly repealed by IGRA. I'll address the questions that came up in Attorney Crowell's argument concerning the meaning of specifically prohibited by federal law, which appears in two places in IGRA. And those two provisions have been cited both by the District Court and by the Fifth Circuit in the Salita case, which was favorably cited by this Court in the Passamaquoddy case in 1996. Moreover, those provisions were cited directly by the Passamaquoddy case at footnote four in support of the conclusion that every circuit court that has considered this question has reached, that IGRA intended to leave room for preexisting and even later enacted federal statutes governing gaming on particular tribal lands. The United States and the tribe are really conflating the two inquiries under IGRA. There's a two-step process for considering whether Class II gaming can proceed under IGRA. The first step is whether such gaming is specifically prohibited by federal law. The second step is whether the state itself prohibits such gaming. As Attorney Harvey stated, and I think she's correct, the Cabazon criminal prohibitory versus civil regulatory dichotomy was carried through with respect to that second inquiry. Does a particular state criminally prohibit Class II gaming such that, even under the balance struck by IGRA, a tribe may not commence Class II gaming operations because a particular state does not allow them for any entity for any reason? If that's the question that we're being asked in Massachusetts, that would not be the case. Massachusetts does allow Class II gaming, and we're not taking the position that it doesn't. The Senate report, on which both sides rely for different reasons, specifically lists the, I believe, six states that at the time criminally prohibited Class II gaming, and it's clear that IGRA was not intended to override that criminal prohibition, but that if states merely regulated, allowed but regulated, Class II gaming, that IGRA would permit tribes to engage in that gaming under self-regulatory standards set forth by IGRA. The first inquiry, which is what we're talking about, is whether gaming is specifically prohibited by federal law. Congress, in passing IGRA, did not intend to sweep clean the field of preexisting state-specific federal enactments or other federal laws pertaining to gaming. Help me with the text here, because I think you've honed in on the key thing, which is such gaming is not otherwise specifically prohibited on Indian lands by federal law. So that's step one of your argument. Step two then necessarily means you're pointing us to a federal law that specifically prohibits gambling on Indian lands, and that's where you then lose me, because I don't see what you point to is then the compact, the statute, the earlier statute, right? Yes, Your Honor. And that's got a statement in it that the settlement lands will be subject to Massachusetts laws that prohibit or regulate gambling. That doesn't read the same to me as saying that there's a federal law. In other words, the federal law, the earlier law, seems to say, you can gamble or not, whatever the state allows you. That doesn't seem to be a federal law that specifically prohibits gambling. Your Honor, I think the way that Congress was looking at it, because all of these state-specific settlement acts that were enacted both before and after IGRA were similar in structure to the Massachusetts Act that subjected gaming to state regulation. I think the way we need to read it is that specifically prohibited by federal law means that you're not allowed under federal law, in this case the Massachusetts Settlement Act, to conduct unlicensed gaming, because under state law in Massachusetts, you cannot conduct unlicensed gaming. Let me give you a hypothetical. Today, Massachusetts law allows gambling. Yes, Your Honor. That's the scenario. Yes, Your Honor. And then tomorrow, Massachusetts law then prohibits gambling. Under your textual analysis, I think you would say on day one, federal law doesn't specifically prohibit gambling, but on day two, suddenly federal law does specifically prohibit it, really because the state law changed between day one and day two. I would say it's a different inquiry. I would agree with Your Honor if, in fact, the Massachusetts Settlement Act did not exist and we were purely looking at whether Massachusetts law criminally prohibited Class II gaming, then Massachusetts would join the list of six or so states that at the time of IGRA did criminally prohibit it, and no private deal. But that would back to the other thing with the textual argument. Yes, Your Honor. Everyone agrees that if Massachusetts flatly, criminally prohibited it, then IGRA itself wouldn't grant the right. Yes, Your Honor. But we're now down to a situation where you rely not on that prohibition, but you're relying on the specific prohibition by federal law clause. Yes, Your Honor. And to put it in context, Your Honor, as I stated earlier, every circuit that has looked at this question, including even this court in Narragansett, as well as in Passamaquoddy, concluded that IGRA did not intend to sweep aside state-specific laws. Congress has been, if I could just conclude my answer, Congress has been very clear in its willingness to give honor and implement agreements between states and local tribes. And even after IGRA was passed in 1988, in 1993 promulgated a similar settlement act with respect to the Catawba tribe in South Carolina, and in 1996 amended the Rhode Island Act to make clear that it didn't, it wasn't impliedly repealed by IGRA. So against that backdrop, there's no basis to conclude that IGRA intended to sweep aside all state-specific settlement acts. Thank you. Good morning, Your Honors. Ronald Raffenthaler, town council for the town of Oklahoma. I have three members. Quickly, a major difference between the Narragansett case and the case in front of this court, our federal act, is that the Narragansett case involved Rhode Island lands. This case involved town lands being conveyed. Our statute, our federal act, makes the land subject to town laws and also adds the language relative to gaming. So let me just back up. The town of Aquinnah is one of the poorest towns in the Commonwealth. It has one road which leads to this casino. It has four police officers. It has a 347-year-round population. We have four full-time policemen. We have a volunteer fire department. We have no business district. The tribe has no public safety services, no police, no fire, no ambulance, no building inspector, no health inspector, no electrical inspector. It all falls to the town. The operational plan, which I point you to at supplemental appendix 263, spells that all out. The town is responsible in the event of any issue relating to the casino, if it were to happen. The town would have to deal with that. We cannot handle that. That's why the protections in the settlement agreement and the state act and the federal act were so important to us because we were conveying town lands, and in return for conveying town lands, we were to get these protections. And among those protections are language that Congress added relating to gaining specific prohibitions in the town and the state. And I would say that from the town end, the particular land that the tribe seeks to gain on, the gaining is prohibited on that specific land by operation of zoning. And I would point to the record on that. That's 8209. So what we would have here is the town acted on a deal that was made, and we deeded out land after the federal act, obviously. Even though we're not required to, we were authorized to after April, we deeded out the deed specifically provides that assumption, the state law, town law, and the federal settlement act. How can there be an implied repeal where the federal act specifically references bingo and games of chance along with state and town laws? There simply cannot be given a time. There are real life consequences here, and the SJC recognized that in the Shellfish Hatchery case, which was cited in 2005. It was cited throughout our brief. It was not appealed. So where it says the tribe is going to be treated like any other Massachusetts corporation when it comes to land use. The United States District Court opinion, Judge Sandel's opinion was excellent, and we think it should be upheld. Thank you, Your Honor. I'd like to respond to just a couple of the comments that were made by the Commonwealth and the Homeowners Association. Let's assume for purposes of argument that at the time of the settlement act or even the time of the Indian Game Regulatory Act, the Massachusetts prohibited all forms of gaming. Well, IGRA would already have covered that situation, as Judge Kayette has pointed out, that no tribe under IGRA can offer games that are otherwise prohibited by state law. But the settlement act didn't say, tribe, you cannot conduct gaming, period. The settlement act said, tribe, you conduct gaming consistent with the laws of Massachusetts. And as the Commonwealth has conceded in the Sorrell argument, that the Commonwealth has always had a civil regulatory process towards bingo, has always allowed bingo. At the time of the settlement act was passed, bingo was allowed by Massachusetts law. At the time the Indian Game Regulatory Act was passed, bingo was allowed by Massachusetts law. And as we sit here today, all forms of casino gaming are allowed by Massachusetts law. So even if they were able to point to the settlement act in a context where in 1987 and 1988, there was a complete prohibition under Massachusetts, that is still not referencing a federal prohibition on gaming. Because as Judge Howard indicated, that's shifting sand. The next day, the state could change its laws. And if you're in Utah or Hawaii or one of those states that in 1988 had a complete prohibition of gaming, and the law changed, then the tribes in those states would be able to, under IGRA, seek compact that allowed for those gaming activities that are no longer prohibited under gaming law. There is no federal prohibition of gaming that the Commonwealth or the Homeowners Association can point to that says is incorporated in and prevents the acquainted tribe from taking advantage of Congress's subsequent passage of the Indian Gaming Regulatory Act. What do you say to the town's argument that if the tribe just puts up a casino there but doesn't change the level of governmental services that it's now providing, that the town will be in dire straits? Well, number one, that's something that's not unique to the situation between the town and the acquainted tribe. Every tribe in the country that's been able to game under the Indian Gaming Regulatory Act is confronted with how do we make sure that patrons are safe? How do we make sure that the gaming is adequately regulated? How do we make sure that non-Indians are prosecuted for the law? And those tribes go out and either work with the NIGC to see that they do it unilaterally or work most often through intergovernmental agreements that, okay, town, you have a police department. We don't. We will pay you to use your police department to prosecute non-Indians on the reservation. And if I may, I know my time is over, but I would like to make just one comment about all this emphasis on police authority. There is no tribe anywhere in the United States that has the jurisdiction to prosecute non-Indians for crimes that are committed on the lands. Either the U.S. Attorney's Office has it. In the one situation in a law passed by Congress two years ago in the context of violence against women, tribal courts, if they have the court, can have it. But otherwise, there are no circumstances where the tribe can arrest and prosecute those non-Indians. What you have are the tribal governments executing their governmental authority by entering into intergovernmental agreements, often referred to as cross-deputization agreements, to have the non-Indian law enforcement available to do that. And the tribe, through its gaming revenue, provides the funds to cover the cost for those services. Thank you all.